2015 IL App (2d) 141201
No. 2-14-1201
Opinion filed May 14, 2015

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| RODRIGUE CEDA MAKINDU, | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14-MR-172 |
| | ) | |
| ILLINOIS HIGH SCHOOL ASSOCIATION, | ) | Honorable |
| | ) | David R. Akemann, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Hutchinson and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1     The instant controversy arose after the defendant, the Illinois High School Association (IHSA), amended one of its bylaws, which had the effect of preventing the plaintiff, Rodrigue Ceda Makindu, from participating on his high school's basketball team. The plaintiff filed a complaint and sought a preliminary injunction in the circuit court of Kane County, asserting that the IHSA's amended bylaw violated his right to equal protection. The trial court granted the plaintiff's motion for a preliminary injunction, and the IHSA appeals from that order. For the reasons that follow, we affirm.

¶ 2                                    BACKGROUND

¶ 3     The plaintiff was born in the Democratic Republic of Congo in 1996. On October 2, 2012, he came to the United States on an F-1 student visa. He arrived with the help of James Schmidt, who is currently the athletic director of the Plano schools. The plaintiff began attending Mooseheart Child City and School, Inc. (Mooseheart). Mooseheart is a residential school that the Moose Fraternal Organization founded over 100 years ago to help students in need. All students reside on campus.

¶ 4     Mooseheart is a member of the IHSA. The IHSA has just over 800 member schools. According to its constitution, the IHSA exists to "provide leadership for the development, supervision and promotion of interscholastic competitions and other activities in which the members engage." The IHSA is administered by a board of directors and its executive director, currently Martin Hickman. Hickman's duties include interpreting IHSA bylaws and making eligibility determinations for students to participate in IHSA activities, including interscholastic sports.

¶ 5     In 2012, the plaintiff, through Mooseheart, sought a determination from Hickman regarding the plaintiff's eligibility to participate in IHSA activities. Hickman informed the plaintiff that, under the current bylaws, the plaintiff would not be able to participate until October 2, 2013.

¶ 6     In 2013, the IHSA amended bylaw 3.034.3. The amended bylaw provided that students who were not participating in "an approved student exchange program" or living with a parent or guardian would not be able to participate in IHSA activities. On October 10, 2013, Hickman informed Mooseheart that, based on the amended bylaw, the plaintiff would not be eligible to participate in interscholastic sports for the duration of his time attending high school.

¶ 7    The plaintiff appealed Hickman's decision to the IHSA board of directors. On December 16, 2013, the board affirmed Hickman's decision.

¶ 8    On February 26, 2014, the plaintiff filed a complaint and a motion for a temporary restraining order (TRO), seeking to set aside Hickman's decision and allow the plaintiff to play interscholastic sports. On February 28, 2014, the trial court denied the plaintiff's motion for a TRO.

¶ 9    On October 1, 2014, the plaintiff filed an amended complaint. The plaintiff sought a declaratory judgment that the amended bylaw violated his equal protection rights under both the United States and the Illinois constitutions. U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2.

¶ 10    On October 27, 2014, the plaintiff filed a motion for a preliminary and a permanent injunction to prevent the IHSA from implementing amended bylaw 3.034.3, thereby allowing him to participate in interscholastic sports for his senior year.

¶ 11    On November 21, 2014, the trial court conducted a hearing on the plaintiff's motion for a preliminary injunction. The plaintiff, Schmidt, and Hickman testified. The parties also submitted several exhibits. That evidence is summarized below.

¶ 12    IHSA bylaws 3.000 through 3.170 govern the eligibility of students to participate in interscholastic sports. Bylaw 3.030 addresses residency and states a "fundamental principle" that "[h]igh school sports are best controlled and conducted fairly when students reside full time with their parents and attend high school in the district in which they reside with their parents." Based on that principle, the bylaws require a student to reside full time with his or her custodial parent(s) or legal guardian(s) to be granted eligibility at either a public school or a private school. Additionally, there are restrictions on eligibility following a transfer from one school to another. Generally, a student is ineligible if the transfer is not in conjunction with a change of residence

by both the student and his or her custodial parent(s) or guardian(s). The bylaws are intended to reinforce the principle that high school students should live with their parents.

¶ 13    Bylaw 3.034.3 concerns the eligibility of "international and foreign exchange students." The bylaw was originally created as an exception to the general residency and transfer requirements, in order to allow international students the opportunity to participate in interscholastic sports during their stay in the United States. International students who are on J-1 visas and who meet the requirements of bylaw 3.034.3 are granted immediate eligibility to participate in sports for one calendar year notwithstanding their transfer of schools and the fact that they are not residing with their parents or legal guardians.

¶ 14    In 2013, the IHSA amended bylaw 3.034.3. The amended bylaw provides:

> "International and Foreign Exchange Students: Students attending school in Illinois under the auspices of approved student exchange programs shall be considered eligible regarding residence and transfer for a maximum period of one calendar year, commencing with the date of their enrollment and beginning attendance at an IHSA member school. To be considered for approval, a foreign exchange program must be approved by the IHSA and the Council on Standards for International Educational Travel (CSIET). It must also assign students to schools by a method which insures that no student, school, or other interested party may influence the assignment for athletic or other purposes. The Board of Directors shall establish additional criteria by which it shall approve foreign exchange student programs. International students attending school in Illinois who are not participating in an approved student exchange program will not be eligible with respect to residence or transfer for the duration of their high school attendance unless they meet the requirements of the applicable provisions of the

residency and transfer By-laws as determined in an official ruling from the Executive Director. For purposes of this By-law, the residential school exception set forth in By-law 3.034.1 shall not apply to establish a student's residency." IHSA, Handbook With Illustrations 2014-2015 School Term 44-45 (2014).

¶ 15 The amended bylaw requires international students to either (1) come through a foreign exchange program approved by CSIET or (2) meet the general residency and transfer requirements that apply to all other students. Students not meeting one of these qualifications are ineligible to participate in interscholastic sports for the duration of their time in high school. Under the previous version of bylaw 3.034.3, such students would be eligible after sitting out for one year. The drafters of the amended bylaw were concerned that the increasing number of international high school students in Illinois who were not placed through approved foreign exchange programs could negatively impact competition.

¶ 16 Historically, the majority of international students attending Illinois high schools came to the United States on J-1 visas, a type of nonimmigrant visa that allows a student a temporary period of stay in the United States. The purpose of a J-1 visa is to enable the student to experience the culture of the United States by living with a host family and attending school here. Under a J-1 visa, students are allowed to remain in the United States only for a calendar year, regardless of whether they attend a public or a private school.

¶ 17 CSIET ensures that international students coming to the United States on J-1 visas are placed at an approved school by an approved foreign exchange program. An approved foreign exchange program must develop and implement procedures to prevent international students from having any control over which schools they attend and to prevent the receiving schools from having any control over which students they receive. The IHSA recognizes such

procedures as playing an important role in preventing any recruiting of international students. The IHSA has therefore looked to CSIET to determine acceptable foreign exchange programs.

¶ 18    International students wishing to study in the United States may also do so under F-1 nonimmigrant visas.  The stated purpose of an F-1 visa is to enable the student to get an education in the United States.  Students on F-1 visas may attend a private school for as long as it takes to complete their program of study.  Beginning in 2014, CSIET's international exchange program oversight included F-1 programs and participating schools.  CSIET recognized the need to begin evaluating F-1 programs because of "a rapid increase in F-1 visa activity" and its desire to "get ahead of this pressing F-1 issue and help prevent athletic recruiting and eligibility issues before they arise."  Thus, international students with F-1 visas could participate in CSIET-approved programs and be eligible for interscholastic sports for a period of one calendar year pursuant to the IHSA's amended bylaw 3.034.3.

¶ 19    Hickman testified that the IHSA amended bylaw 3.034.3 to level the playing field between boundaried schools (typically public) and nonboundaried schools (typically private) by reducing the effect of participation by F-1 students on competition between schools.  Unlike boundaried schools, private nonboundaried schools such as Mooseheart can accept students from anywhere in the world.  Hickman testified that therefore schools such as Mooseheart enjoy an inherent advantage when it comes to attracting students on F-1 visas, because such students can attend public school for a maximum of only one year and must pay full tuition whereas they can possibly attend private school for free and for as long as it takes to complete their education. Further, students on F-1 visas are free to select their schools whereas students on J-1 visas are randomly placed in schools and are limited to one year of attendance.  Hickman testified that the

IHSA's members were concerned that the prior version of the bylaw gave schools like Mooseheart a "tremendous advantage."

¶ 20    Hickman further testified that, during its deliberations, the IHSA board considered a document that the executive director of CSIET had prepared. According to that document, the number of students attending schools in the United States on F-1 visas had increased from 6,500 in 2007 to 77,000 in 2013. In comparison, approximately 25,000 students attended school on J-1 visas in 2013.

¶ 21    The IHSA also considered a document that the National Federation of State High School Associations had authored, which described numerous concerns arising from the athletic participation of F-1 visa students who do not come through approved foreign exchange programs that randomly place foreign students. Those concerns include:

(a) Displacement of students and lost participation opportunities for eligible students who have "paid their dues" in the hope of seeing playing time;

(b) International students who come to the United States without the accompaniment of their parents/guardians are analogous to domestic students who transfer without a corresponding change of family residence; such students would not be eligible;

(c) "Team shopping" is at odds with the high school model of academic primacy;

(d) F-1 visa programs are ripe for abuse in the transfer process; a student on a J-1 visa in an approved program typically has no say in selecting the school, but a student on an F-1 visa, absent a state association rule, could choose the school based solely on an immediate sports opportunity, which would also put other students at an immediate and irreparable displacement risk;

(e) Scouting services and internet search engines have created a worldwide market in which athletes and recruiters can find each other, all to the disadvantage of rule-abiding students and school personnel;

(f) Rules restricting participation by certain international students promote amateurism, inhibit "power-loading" of select schools, and impede the exploitation of students by schools and boosters; and

(g) Such rules discourage recruiting, prevent the over-emphasis of athletics, and maintain the focus of secondary schools on their primary purpose: academic preparation of students for their adult lives.

¶ 22    The IHSA also presented evidence that associations in other states, such as Indiana and Kentucky, had adopted similar rules restricting participation by international students in nonapproved programs. Some states, such as Ohio, had chosen to limit the number of international students who may participate at any member school.

¶ 23    Schmidt testified that the plaintiff had e-mailed him and asked about playing basketball in the United States. Schmidt forwarded his e-mail correspondence with the plaintiff to Karl Rife, the executive director of Mooseheart. Schmidt contacted Mooseheart because he knew that there would be no tuition there. Mooseheart ultimately accepted the plaintiff as a student and waived his tuition.

¶ 24    The parties also presented evidence that the IHSA and Mooseheart had been involved in previous litigation. That litigation involved three Sudanese students who were on Mooseheart's basketball team. Those students enrolled at Mooseheart after being involved with A-HOPE, an organization whose function is to recruit African basketball players to play in the United States. Although the IHSA's board of directors eventually ruled that the players were eligible to

participate, it placed Mooseheart on probation and indicated that thereafter any students sponsored by A-HOPE would not be eligible. Mooseheart won the 2014 Class A boys basketball state tournament with the participation of the Sudanese students.

¶ 25    On December 1, 2014, the trial court issued an order granting the plaintiff's motion for a preliminary injunction and enjoining the IHSA from enforcing its amended bylaw. The trial court found that the plaintiff had raised a "fair question" that his right to equal protection had been violated. The trial court noted that Hickman testified that the bylaw in question was not about recruiting but rather about maintaining a level playing field. However, Hickman also acknowledged that merely allowing a student classified as "international" to participate did not equate to creating an uneven playing field.

¶ 26    The trial court additionally found that a preliminary injunction was warranted because the plaintiff had established the likelihood of succeeding on the merits of his claim. In so finding, the trial court found particularly telling a statement in the IHSA's response to the plaintiff's motion: "Mooseheart is apparently content to be the destination for international basketball players in its effort to repeat as state champions, to the extreme displeasure of its fellow private member schools." The trial court found that this was "at the heart of what is really going [on] and generates a significant reason for the amended bylaw which uses an undefined term [(international)] to deny a privilege for an unknown quantity of students statewide, but one which IHSA asserts, certainly includes [the plaintiff]." The trial court additionally emphasized that the IHSA does not track either F-1 students or undocumented students and therefore does not know how many students would be denied participation under the amended bylaw.

¶ 27    Further, the trial court found that, if the IHSA had not amended the bylaw, the plaintiff would have been able to play basketball during his senior year. Thus, maintaining the status quo

warranted entering a preliminary injunction on the plaintiff's behalf. Moreover, in balancing the hardships among the parties, the trial court found that the plaintiff was more entitled to relief.

¶ 28 Following the trial court's ruling, the IHSA filed a timely notice of appeal.

¶ 29                                    ANALYSIS

¶ 30 The IHSA argues that the trial court's decision should be reversed because the trial court failed to consider whether the plaintiff established the elements required for injunctive relief. Rather, the IHSA contends, the trial court's decision was based on the amended bylaw's failure to define the term "international student." The IHSA insists that the amended bylaw's failure to define that term was irrelevant to whether the plaintiff had established a substantial likelihood of success on the merits. The IHSA further argues that the trial court failed to afford due deference to the IHSA's well-established right to craft and enforce bylaws deemed necessary by its membership to further the IHSA's legitimate interests in creating a level playing field and preventing recruitment of foreign athletes.

¶ 31 A preliminary injunction is an "extraordinary" remedy that "should be granted only in situations of extreme emergency or where serious harm would result if the preliminary injunction was not issued." *Clinton Landfill, Inc. v. Mahomet Valley Water Authority*, 406 Ill. App. 3d 374, 378 (2010). The purpose of preliminary injunctive relief is not to determine controverted rights or decide the merits of the case, but to prevent a threatened wrong or continuing injury and preserve the status quo with the least injury to the parties concerned. *In re Marriage of Jawad*, 326 Ill. App. 3d 141, 154 (2001). In order to obtain preliminary injunctive relief, the plaintiff must establish: (1) a clearly ascertained right in need of protection; (2) irreparable injury in the absence of an injunction; (3) the lack of an adequate remedy at law; and (4) a likelihood of success on the merits of the case. *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 62

(2006). If these elements are met, then the court must balance the hardships and consider the public interests involved. *Id.* To obtain a preliminary injunction, the plaintiff must raise a "fair question" that each of the elements is satisfied. *Clinton Landfill*, 406 Ill. App. 3d at 378.

¶ 32 In reviewing the grant of a preliminary injunction, we examine only whether the party seeking the injunction has demonstrated a *prima facie* case that there is a fair question concerning the existence of the claimed rights. *People ex rel. Klaeren v. Village of Lisle*, 202 Ill. 2d 164, 177 (2002). The decision to grant or deny a preliminary injunction rests within the sound discretion of the trial court, and on review the decision will not be disturbed absent an abuse of discretion. *Id.* However, where the trial court does not make any factual findings and rules on a question of law, the appellate court's review is *de novo*. *Clinton Landfill*, 406 Ill. App. 3d at 378. Issues that invoke *de novo* review include whether a statute is unconstitutional on its face (*World Painting Co. v. Costigan*, 2012 IL App (4th) 110869, ¶ 12) and whether a contract is ambiguous (*Gassner v. Raynor Manufacturing Co.*, 409 Ill. App. 3d 995, 1006 (2011)).

¶ 33 Here, there was a factual component to the trial court's decision. Specifically, the trial court found that the IHSA had not demonstrated how many students would be affected by its amended bylaw. The trial court additionally found that the IHSA did not show that international students were better athletes or that they would necessarily negatively affect competition. Thus, we will not disturb the trial court's decision absent an abuse of discretion. *Klaeren*, 202 Ill. 2d at 177.

¶ 34 We next turn to whether the plaintiff established the elements necessary for the issuance of a preliminary injunction. First, we consider whether the plaintiff sufficiently established that he had a right in need of protection. The IHSA is a state actor. See *Petrie v. Illinois High School Ass'n*, 75 Ill. App. 3d 980, 981 (1979). Two standards of judicial review are applied in

determining whether the state has created unconstitutional classifications. Initially, the court must determine if the law or rule under consideration affects a "fundamental right" or discriminates against a suspect class. In that case, a strict scrutiny test will be applied, and the rule or law will be upheld only if it is narrowly tailored to serve a compelling state interest. *Jenkins v. Leininger*, 277 Ill. App. 3d 313, 321-22 (1995). Where neither a "fundamental right" nor a suspect class is involved, a legislative enactment is presumptively valid and will survive constitutional scrutiny if it is rationally related to a legitimate governmental purpose. *Id*. at 322. Under the rational relationship test, the means chosen to achieve a governmental objective need not be the best possible means; they need only be measures that rational people believe might help to achieve the objective. *Id.*

¶ 35    The IHSA's amended bylaw treats foreign students differently from each other depending on whether a student lives with a parent or guardian. As such, the IHSA's amended bylaw implicates equal-protection concerns. See *Rajterowski v. City of Sycamore*, 405 Ill. App. 3d 1086, 1099 (2010). We need not determine, however, which level of scrutiny applies, because even under the more deferential test—the rational-relationship test—the plaintiff has raised a fair question that his right to equal protection has been violated. See *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1065 (9th Cir. 2014) (need not determine what standard of scrutiny applies where law at issue would fail rational-basis review); see also *Nyquist v. Mauclet*, 432 U.S. 1, 7 (1977) (requiring application of strict scrutiny to state action that discriminates against noncitizens authorized to be present in the United States).

¶ 36    The IHSA explained that the reason for amending the bylaw was to foster fair competition. However, the IHSA also acknowledged that merely allowing some students classified as international to participate does not mean that those students will cause the playing

field to be unfair. We also note that there was no evidence that the plaintiff's individual ability would disrupt competitive balance. Further, there was no evidence that a student who lives at a residential school, as opposed to with a parent or guardian, and participates in interscholastic sports will disrupt fair competition. Thus, the evidence does not establish any correlation between the IHSA's amended bylaw and its purported objective in amending it. As such, we cannot say that the trial court abused its discretion in determining that the plaintiff has raised a fair question that the IHSA's amended bylaw violates his right to equal protection.

¶ 37 We further note that the IHSA's amendment of the bylaw seems to be related to its recent conflicts with Mooseheart. This is evident in part from the IHSA's acknowledgment that it is unaware how the amended bylaw will affect any school other than Mooseheart. The conflict between the IHSA and Mooseheart seems to have arisen due to the three international students who played for Mooseheart and helped Mooseheart win the 2014 Class A boys basketball state tournament. The evidence suggests that those students might have been recruited to play at Mooseheart. However, the IHSA already has antirecruiting bylaws in effect that would prevent the reoccurrence of such an event. Further, the IHSA acknowledges that no one recruited the plaintiff to play at Mooseheart. The IHSA's recent interactions with Mooseheart, standing alone, cannot serve as a valid basis for the amendment. See generally *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973) ("[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare *** desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.").

¶ 38 As to the plaintiff's likelihood of success on the merits of his claim, we consider that element next because, once the plaintiff established a fair question that his rights had been violated, he also established a fair question that he would likely prevail on his claim. See

*Brewer*, 757 F.3d at 1065 (whether plaintiff will likely succeed on merits of claim involves same analysis as to whether he has raised fair question that his rights have been violated).

¶ 39    The IHSA insists that the "lynchpin" of the trial court's determination that the plaintiff had raised a fair question that he would likely succeed on the merits of his claim was the IHSA's failure to define the term "international" student.  As that term has a readily definable meaning, the IHSA requests that we take judicial notice of that term and conclude that the bylaw was constitutional.

¶ 40    In finding that the plaintiff had established a likelihood of success on the merits of his claim, the trial court noted that the amended bylaw did not define the term "international."  The trial court expounded that the bylaw did not explain whether it applied to students on F-1 visas, on J-1 visas, or illegally in the country.  The trial court further observed that the IHSA did not know how many students would be affected by the amended bylaw.  Moreover, the trial court found that there was no showing that international students would necessarily be better basketball players or that they would necessarily have a negative effect on competition.

¶ 41    We disagree with the IHSA's assessment that the bylaw's failure to define the term "international" was the "lynchpin" of the trial court's decision.  Although the trial court made reference to the lack of a definition for that term, the entirety of its rationale demonstrates that it was more concerned about the lack of evidence that the amendment would in any way facilitate its stated objective of promoting fair competition.  We cannot say that the trial court's determination constituted an abuse of discretion.

¶ 42    Turning to whether the plaintiff has established that the IHSA's actions have subjected him to irreparable injury, we note that, when a violation of constitutional rights has been alleged, a further showing of irreparable injury is not required if what is at stake is not monetary

damages. *Preston v. Thompson*, 589 F.2d 300, 303 (7th Cir. 1978). This rule is based upon the belief that equal-protection rights are so fundamental to our society that any violation of those rights causes irreparable harm. *Baskin v. Bogan*, 983 F. Supp. 2d 1021, 1028 (S.D. Ind. 2014). Accordingly, we agree with the trial court's determination that the plaintiff sufficiently alleged that he would suffer irreparable harm.

¶ 43    Relying on *People ex rel. Bolton v. Progressive General Insurance Co.*, 84 Ill. App. 2d 109, 114 (1967), the IHSA insists that the plaintiff's delay in seeking a preliminary injunction refutes the existence of any extreme emergency and therefore defeats any claim that he was subjected to irreparable injury. However, delay is only one among several factors to be considered in the issuance of a preliminary injunction. *Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979). There is no general rule that irreparable injury cannot exist if the plaintiff delays in seeking a preliminary injunction. *Id.* Indeed, even in the case the IHSA relies upon, *Bolton*, the reviewing court determined that the plaintiff's delay in seeking a preliminary injunction did not preclude the issuance of a preliminary injunction. See *Bolton*, 84 Ill. App. 2d at 114. Here, as the plaintiff filed his motion for a preliminary injunction before the IHSA's amended bylaw would have prevented him from playing basketball during his senior year at Mooseheart, we cannot say that the trial court abused its discretion in determining that the plaintiff had established that he would be subjected to irreparable injury if the preliminary injunction were not issued.

¶ 44    As to the lack of an adequate remedy at law, this can be established by the threat of irreparable harm or other harm that cannot be adequately corrected by the payment of monetary damages. *Petrzilka v. Gorscak*, 199 Ill. App. 3d 120, 124 (1990). Here, the plaintiff alleged that, if the IHSA's amended bylaw were upheld, he would not be able to play for his high school

basketball team at all before he graduates. This is the type of harm that could not be corrected by monetary damages.

¶ 45    We also find that the trial court properly determined that allowing the plaintiff to play basketball during his senior year best maintained the status quo. A preliminary injunction is intended to maintain the status quo rather than alter it. *People v. Van Tran Electric Corp.*, 152 Ill. App. 3d 175, 183 (1987). "Status quo" means "the last actual, peaceable, uncontested status which preceded the pending controversy." *O'Brien v. Matual*, 14 Ill. App. 2d 173, 187 (1957). Often maintaining the status quo means keeping all actions at rest, but sometimes it happens that the status quo is not a condition of rest but rather one of action and that the condition of rest is exactly what will inflict the irreparable harm. *Brooks v. La Salle National Bank*, 11 Ill. App. 3d 791, 799 (1973).

¶ 46    Here, had the IHSA not amended the bylaw, the plaintiff would have been able to play high school basketball during his senior year. The constitutionality of that amended bylaw is what the parties are disputing. Thus, to return the parties to where they would have been without the controversy, they must be returned to where they were before the bylaw was enacted. As that is what the trial court did, the trial court properly maintained the status quo.

¶ 47    The last factor for the trial court to consider before entering a preliminary injunction is whether the equities warrant the entry of such an order. In balancing the equities, the trial court must weigh the benefits of granting the injunction against the possible injury to the opposing party. *Schweickart v. Powers*, 245 Ill. App. 3d 281, 291 (1993). In balancing the equities, the trial court should consider the injunction's effect on the public interest. *Kalbfleisch v. Columbia Community Unit School District Unit No. 4*, 396 Ill. App. 3d 1105, 1119 (2009). Here, the trial court found that the equities favored allowing the plaintiff to play basketball. We cannot say that

the trial court's determination constituted an abuse of discretion. Although the IHSA's stated objective in amending the bylaw was to ensure fair competition, there is no evidence that the plaintiff's participation on his high school basketball team would adversely affect competition. Conversely, the plaintiff would miss out on a unique opportunity to play basketball for his high school team if the preliminary injunction were not entered.

¶ 48    In determining that the trial court properly entered the preliminary injunction, we reject the IHSA's argument that its amended bylaw is entitled to great deference. Relying on *Proulx v. Illinois High School Ass'n*, 125 Ill. App. 3d 781, 787 (1984), and *Lee v. Snyder*, 285 Ill. App. 3d 555, 560 (1996), the IHSA argues that a court cannot substitute its judgment regarding the application of an association's bylaw absent clear and convincing evidence that the bylaw was enacted as the result of fraud, collusion, or mistake of fact. However, an association's bylaw cannot violate one's constitutional rights. See *Griffin High School v. Illinois High School Ass'n*, 822 F.2d 671, 675-76 (7th Cir. 1987) (association's bylaws cannot violate person's right to equal protection); see also *Lee*, 285 Ill. App. 3d at 559 (acknowledging an exception to the general rule of noninterference with an association's bylaws where one's constitutional rights are at issue). Thus, as the plaintiff's equal-protection rights were at issue, the trial court was not obligated to defer to the IHSA's judgment in the amendment of bylaw 3.034.3.

¶ 49                                    CONCLUSION

¶ 50    For the reasons stated, the judgment of the circuit court of Kane County is affirmed.